**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian M. Katt, et al., | No. CV-14-08042-PCT-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Jordan J. Riepe, et al., | |
| Defendants. | |

Plaintiffs have filed a motion for partial summary judgment (Doc. 102), an application for default judgment against Defendants BizDoc, Inc. and Michael Shumacher (Doc. 96), and a motion to strike (Doc. 134). Defendants E. Duane Weston, Janette S. Riepe, and McCarthy Weston, PLLC (collectively, the "Weston Defendants") have filed a motion for summary judgment on all of Plaintiffs' claims (Doc. 113) and a motion to strike (Doc. 131). The motions are fully briefed, and no party has requested oral argument. For the reasons that follow, the Court will deny Plaintiffs' motion for summary judgment, grant in part and deny in part the Weston Defendants' motion for summary judgment, deny Plaintiffs' motion to strike, deny the Weston Defendants' motion to strike, and deny Plaintiffs' application for default judgment.

**I.    Background.**

This case arises out of Plaintiffs' sale of their vehicle towing business, U.S. Metro Towing and Recovery, LLC. Doc. 111, ¶ 1. In February 2013, Plaintiffs Brian and

Rachel Katt and U.S. Metro hired Comprehensive Business Services, LLC, d/b/a WCI Business Opportunities ("WCI Brokers"), and one of its brokers, Dominic Femia, to represent them in the transaction. *Id.*, ¶ 2. One of U.S. Metro's former employees, Jordan Riepe, sought to form his own company with his mother, Defendant Janette Riepe, and expressed interest in purchasing U.S. Metro. *Id.*, ¶¶ 3, 4. The parties eventually agreed on a purchase price of $290,000. *Id.*, ¶ 12.

Jordan hired attorney Defendant E. Duane Weston and his firm, Defendant McCarthy Weston, PLLC, to represent him in negotiations with the Katts and U.S. Metro. *Id.*, ¶ 5. Janette worked for McCarthy Weston, PLLC as its office manager and paralegal. *Id.*, ¶ 6. In order to secure financing, Femia referred Jordan to Defendant BizDoc, Inc., owned and operated by Defendant Michael Shumacher, and Jordan contacted BizDoc to obtain a $400,000 loan (the "Loan"). *Id.*, ¶¶ 7, 9. Jordan filled out the necessary paperwork and paid BizDoc a $7,500 fee. *Id.*, ¶¶ 8, 9.

On June 5, 2013, the Katts and Jordan executed a "Business Assets Purchase Agreement" (the "Purchase Agreement"), in which the parties agreed that (1) the transaction would close on or before July 1, 2013; (2) Mendel Blumenfeld would act as the closing agent and receive and disburse funds; (3) U.S. Metro would transfer its assets free of any liens or encumbrances; (4) U.S. Metro would tender the Bill of Sale and title to all its assets and obtain written consent from the necessary parties to transfer the assets; and (5) U.S. Metro would deliver possession and ownership of all assets at closing. *Id.*, ¶¶ 10, 12. The Purchase Agreement provided that it was the entire agreement of the parties and could not be modified except in writing. *Id.*, ¶ 12.

Although Jordan provided BizDoc with the necessary due diligence information, BizDoc informed Jordan that it would not disburse the funds for the Loan in time for closing. *Id.*, ¶¶ 13, 14. In order to continue the transaction, Jordan requested a loan from BizDoc in the amount of $40,000 (the "Bridge Loan"), which the parties agreed was to signify an initial payment at closing. Doc. 123, ¶ 18. The effective date of sale would remain July 1, 2013, and the Katts agreed to accept the remaining $250,000 at a later

1  date. *Id.* During these negotiations, the Katts were in the process of moving to Texas.
2  *Id.*, ¶ 15.

3  On June 30, 2013, BizDoc sent an email to Jordan and Janette notifying them that
4  the funds for the Loan would take an additional 60-75 days to disburse, but BizDoc was
5  making arrangements for the Bridge Loan to disburse during the week of July 15.
6  Doc. 111, ¶ 20. Jordan and Janette forwarded a copy of the email to the Katts, and Brian
7  Katt allegedly called BizDoc to confirm. *Id.*, ¶¶ 21, 22.

8  With these assurances, on July 2, 2013, the parties executed a "First Amendment
9  to Purchase Contract." *Id.*, ¶ 25. Under the First Amendment, the closing date remained
10 July 1, 2013; Jordan was to pay $40,000 to U.S. Metro by July 17, 2013; and the
11 remaining balance of $250,000 would be paid by October 1, 2013. *Id.*, ¶¶ 28, 30. Prior
12 to executing the First Amendment, however, the parties learned that Mendel Blumenfeld
13 had not been engaged as the closing agent. *Id.*, ¶ 31. Weston, Jordan's attorney,
14 informed the parties that the funds could be deposited into his firm's trust account to be
15 held for the transaction, and the parties agreed. Doc. 106, ¶ 9. Weston then prepared the
16 Bill of Sale, which was signed by U.S. Metro and the Katts at the closing. *Id.*, ¶¶ 11-13.
17 The Bill of Sale indicated that U.S. Metro "has this day sold to Jordan Riepe the assets
18 identified in the Purchase Agreement free and clear of all liens and encumbrances."
19 Doc. 111, ¶ 39. The Katts gave the property keys to Jordan. Doc. 130 at 6.[1]

20 Ultimately, BizDoc failed to fund the Bridge Loan by July 17, 2013, and on
21 July 24, 2013, the parties executed a "Second Amendment to Purchase Contract" to
22 extend the deadline for the payment of the $40,000 Bridge Loan until August 2, 2013.
23 Doc. 111, ¶¶ 40, 41. Jordan and Janette continued to check on the status of the Loans.
24 *Id.*, ¶ 43.

25 On July 26, 2013, BizDoc informed Jordan and Janette via email that the funding
26 would take a few more days. *Id.*, ¶ 44. On August 1, 2013, BizDoc sent the following

27
28
---
[1] Page citations to electronically filed documents will refer to the stamped CM/ECF page numbers at the top of the page, not the original document's page numbers.

- 3 -

email to Janette:

> [M]y best guess for a funding date on the bridge loan would be next Friday, August 9, 2013 (give or take 2 business days). I will have documents over tomorrow for the senior secured bridge loan of $65,000 for review. Quite frankly, I do not know how to get comfortable moving forward with the $400,000 permanent funding terms sheet at this point. As I have repeatedly said the purchase price is extremely over valued . . . and now we are dealing with an adversarial relationship and threats toward you of litigation from the seller.

*Id.*, ¶ 46; Doc. 111-14. Janette responded to BizDoc that this was the first time she had heard that the business was overvalued. Doc. 111, ¶ 48. She also relayed the contents of the email to Brian Katt, but did not mention BizDoc's concern that U.S. Metro was overvalued. *Id.*, ¶¶ 49-50. Shortly thereafter, BizDoc forwarded a loan agreement to Jordan, which he completed and returned. *Id.*, ¶ 51. BizDoc never disbursed any funds for the transaction. *Id.*, ¶ 53.

The Katts and U.S. Metro nonetheless continued with the sale, executing a "Third Amendment to Purchase Agreement." *Id.*, ¶ 54. The purchase price was increased to $300,000, of which $281,298.04 represented a carryback loan from U.S. Metro to Jordan. *Id.*, ¶ 55. Jordan executed a promissory note and agreed to pay $4,220 per month, $3,000 of which was paid directly to U.S. Metro and $1,220 to Sovereign/Santander Bank ("Santander") for a tow truck payment. *Id.*, ¶¶ 56-57. Santander refused Jordan's November payment because U.S. Metro leased the truck and did not obtain Santander's consent to sell it. *Id.*, ¶ 59. Jordan eventually discovered that all of the tow trucks had been pledged as collateral, and they were all repossessed by December 2013. *Id.*, ¶¶ 64-67. In addition, several of U.S. Metro's contracts had been inactive or never existed. *Id.*, ¶ 68. Plaintiffs never received full payment for the sale of their business, and Jordan and Janette allegedly refused to return U.S. Metro's assets to the Katts. Doc. 106, ¶¶ 21, 23.

On March 14, 2014, Plaintiffs filed a complaint against Jordan, Janette, J.A.R.R. Towing & Recovery LLC, Weston, McCarthy Weston, PLLC, Femia, WCI Brokers,

- 4 -

1 Shumacher, and BizDoc alleging (1) breach of fiduciary duty, (2) constructive fraud, (3) fraud, (4) deceit, (5) negligence, (6) breach of contract, (7) tortious breach of the covenant of good faith and fair dealing, (8) unjust enrichment, (9) declaratory relief, and (10) RICO violations.  Doc. 1.  Plaintiffs move for summary judgment on count one.  The Weston Defendants move for summary judgment on all counts.  Plaintiffs also ask the Court to enter a default judgment against BizDoc and Shumacher.

**II.     Motions for Summary Judgment.**

   **A.     Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered."  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

   **B.     Breach of Fiduciary Duty.**

Both Plaintiffs and the Weston Defendants seek summary judgment on this claim. Plaintiffs argue that Weston agreed to act as escrow agent for the transaction when he offered to hold the funds in his firm's trust account and subsequently breached the

fiduciary duties arising out of that capacity.  Defendants assert that there is a question of fact as to whether Weston agreed to act in such a capacity, and even if he did, he did not breach his duties as escrow agent.[2]

Defendants admit that Weston agreed to act as escrow agent at least for the first funding scenario, i.e., the $40,000 Bridge Loan.  Doc. 111, ¶ 37.  The testimony of Femia and Janette confirms this fact.  *See* Doc. 105-2 at 5-6; Doc. 105-3 at 5-6.  Plaintiffs argue that Weston breached his fiduciary duties in the following ways:  (1) failing to disclose that it would be a conflict of interest for him to represent Jordan and serve as the escrow agent, (2) failing to create escrow instructions, and (3) failing to hold the Bill of Sale in trust and permitting it to be turned over to Jordan.  Doc. 103 at 11-12.  Defendants assert that Weston did not breach any fiduciary duties because no escrow was ever opened, and Weston could not have violated escrow instructions because none were ever created.

In Arizona, "[t]he escrow relationship gives rise to two distinct fiduciary duties." *Maganas v. Northroup*, 663 P.2d 565, 568 (Ariz. 1983).  These include: (1) the duty "to act in strict compliance with the terms of the escrow agreement" and (2) the duty "to disclose known fraud."  *Id.*  Generally, an escrow agent has no duty to "police the affairs of its depositors" and has "no duty to go beyond the escrow instructions and notify any party to the escrow of any suspicious fact or circumstance that may come to his or her attention."  28 Am. Jur. 2d *Escrow* § 24.

It is undisputed that the Purchase Agreement, Bill of Sale, and Amendments did not identify Weston as the escrow agent or contain any instructions for the escrow agent regarding disbursement of funds or holding documents in trust.  *See* Doc. 111-4 (Purchase Agreement); Doc. 111-10 (Bill of Sale), Doc. 111-11 (Second Amendment); Doc. 111-18 (Third Amendment).  The sole escrow instruction is contained in the Purchase Agreement, which requires the "closing agent" to "obtain a UCC lien and judgment search *upon opening of escrow*[.]"  Doc. 105-7 at 5 (emphasis added).  It is

---

[2] Confusingly, Defendants admit that Weston offered to act as escrow, but still maintain there is a question of fact regarding that very issue.  Doc. 113 at 11.

undisputed that Weston never performed the UCC-1 search.  It is also undisputed that no party, including Weston, created any escrow instructions or instructed Weston to hold the Bill of Sale.  *See* Doc. 111, ¶¶ 33-35; Doc. 123, ¶¶ 33-35; Doc. 111-5 at 28 (Brian Katt testifying that he did not give Weston any instructions).  Most importantly, it is undisputed that no funds were ever deposited in McCarthy Weston, PLLC's trust account.

"There can be no escrow without the conditional delivery of the instrument to a third person as the depositary."  28 Am. Jur. 2d *Escrow* § 12.  Moreover, "[t]he deposit of an instrument by one party without the agreement of the other party or parties does not create an escrow."  *Id.*  Courts have recognized and applied these principles for decades.  *See In re Shelbyville Rd. Shoppes, LLC*, 775 F.3d 789, 798 (6th Cir. 2015) ("To create an escrow, the deposit of the instrument in pursuance of such [an escrow agreement] must be absolute and beyond the control of the depositor." (internal quotations omitted)); *Bell Bros. v. Bank One, Lafayette, N.A.*, 116 F.3d 1158, 1160 (7th Cir. 1997) ("Indiana treats delivery of the property to the depository as an essential element of an escrow."); *Scholz Homes Inc. v. Wallace*, 590 F.2d 860, 863 (10th Cir. 1979) (escrow agreement unenforceable where money was never delivered to escrow agent); *Weldon v. First Citizens Bank of Billings*, 856 P.2d 225, 227 (Mont. 1993) ("In order for an instrument to operate as an escrow, delivery to a third party, such as an escrow agent, who is not a party to the transfer transaction, is required."); *Jurgens v. Abraham*, 616 F. Supp. 1381, 1385 (D. Mass. 1985) ("Although an agent may be liable for negligence in failing to perform his duties in accordance with the escrow agreement, he has no duties or liabilities to either party until a deposit is made with him."); *Stein v. Rand Const. Co., Inc.*, 400 F. Supp. 944, 948 (S.D.N.Y. 1975) (noting that "[f]undamental to the existence of an escrow is the transfer of the escrow instrument into the hands of a third party as depository" (internal quotations omitted)).

In *Muscara v. Lamberti*, 519 N.Y.S.2d 265, 266 (N.Y. App. Div. 1987), the plaintiff entered into an agreement with his former wife wherein the "plaintiff consented

1   to the adoption of his son by the former wife's new husband upon the condition . . . that
2   the wife repay to the plaintiff the sum of $20,000[.]" The parties agreed that the sum
3   would be paid by the wife into the escrow account of the wife's attorney, Fensterman. *Id.*
4   The adoption was finalized, but the wife never deposited the $20,000, and the plaintiff
5   brought suit against the former wife and Fensterman, arguing that Fensterman breached
6   his fiduciary duties as the escrow agent. *Id.* at 266-67. The appellate court affirmed the
7   trial court's grant of summary judgment in favor of Fensterman. *Id.* at 267. It noted that
8   "[a]n essential element of an escrow is the delivery of the subject of the escrow to the
9   designated escrow agent[.]" *Id.* Because Fensterman never received the $20,000, he
10  never became a fiduciary and was not subject to liability. *Id.*

11  Like *Musacara*, Weston never received the subject of the escrow: the $40,000
12  Bridge Loan from Jordan for deposit into McCarthy Weston's bank account. Nor did he
13  receive any property from any party to hold in trust. Thus, even though he had
14  authorized the funds to be deposited into his account, *see* Doc. 106, ¶ 14, no escrow was
15  created, Weston owed no fiduciary duties to Plaintiffs, and he cannot be held liable for
16  failing to perform the UCC-1 search or failing to disclose any known fraud. In addition,
17  he cannot be liable for failing to create escrow instructions because this is generally left
18  to the parties. *See Maganas*, 663 P.2d at 568 (noting the only two duties owed by escrow
19  agent are the duty to strictly comply with escrow instructions and the duty to disclose
20  known fraud).[3]

21  To the extent that Plaintiffs argue the subject of the escrow was the Bill of Sale
22  and that Weston should have known not to turn it over to Jordan, this argument fails for
23  several reasons. First, there is no evidence that the Bill of Sale was ever delivered to
24  Weston to hold in escrow. Second, it is undisputed that neither Plaintiffs nor any
25  Defendants contemplated, let alone instructed, Weston to hold the Bill of Sale. Third, if

---

[3] Plaintiffs also argue that Weston breached his fiduciary duty by failing to disclose that he was representing Jordan. As stated above, no fiduciary duties arose, and even if they had, Plaintiffs had full knowledge that Weston was representing Jordan in the transaction.

- 8 -

1  Weston did hold the Bill of Sale, it may have constituted breach of the Purchase
2  Agreement, which required Plaintiffs to deliver the Bill of Sale directly to Jordan on
3  July 2, 2013.  Doc. 105-7 at 10 ("Seller shall deliver to Buyer, at Closing of the sale, a
4  Bill of Sale for all Assets . . . .").  Fourth, Plaintiffs signed the Bill of Sale with full
5  knowledge that it would immediately be turned over to Jordan even though BizDoc had
6  not funded the Bridge Loan.  *See* Doc. 111-5 at 33-34 (Brian Katt testifying that he
7  reviewed the Purchase Agreement and knew that possession of the property was to
8  transfer to Jordan at the July 2 closing and that BizDoc had not yet funded the Loan).

9  In sum, the undisputed facts establish that Weston's offer to act as escrow agent
10 never came to fruition, an escrow was never opened, and Weston therefore was not
11 required to act as a fiduciary to Plaintiffs.  Summary judgment will be granted in favor of
12 Weston and McCarthy Weston, PLLC on this claim.

### C. Fraud, Constructive Fraud, & Deceit.

The Weston Defendants move for summary judgment on Plaintiffs' claims for fraud, constructive fraud, and deceit.  In order to demonstrate fraud, a plaintiff must establish the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; and (9) the hearer's consequent and proximate injury.  *Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033-34 (Ariz. Ct. App. 2010).  "Constructive fraud is defined as a breach of legal or equitable duty which, without regard to moral guilt or intent of the person charged, the law declares fraudulent because the breach tends to deceive others, violates public or private confidences, or injures public interests." *Lasley v. Helms*, 880 P.2d 1135, 1137 (Ariz. Ct. App. 1994).  Constructive fraud "requires the existence of a fiduciary or confidential relationship."  *Id.* at 1138.[4]

---

[4] Plaintiffs' claim for deceit appears to be treated the same as a claim for fraud under Arizona law.  *See Brown v. Karas*, 237 P.2d 799, 802 (Ariz. 1952) (listing elements necessary for a claim of "fraud and deceit"); *see also Spann v. Meidinger*, 295

- 9 -

### 1. Janette's Summary of BizDoc's Email.

Plaintiffs assert Janette is liable for fraud for misrepresenting statements contained in an email from BizDoc. On August 1, 2013, BizDoc sent Janette an email in which it stated that "the purchase price is extremely over valued" and expressed concern over "threats . . . of litigation from the seller." Doc. 122 at 15. Janette then sent the following email to Brian Katt:

> I don't want to stress you out, but in the spirit of open communication, Mike has said that given the threat of litigation, he is not sure that they will fund the full amount, so PLEASE do not contact him and do not have Dominic contact him . . . .

*Id.* Plaintiffs claim this email concealed the material fact that BizDoc believed U.S. Metro to be overvalued and thereby "dissuaded Mr. Katt from contacting BizDoc and learning about BizDoc's stated concerns[.]" *Id.* In addition, Plaintiffs point to several emails from Janette evidencing her desire to prevent the sale from falling through. *Id.* at 15-16. Plaintiffs contend that had they known of BizDoc's concern, they would have cancelled the transaction.

The emails cited by Plaintiffs do not establish that Janette had any intent to defraud. They merely represent her desire that the transaction continue as contemplated by the parties. There is simply no evidence that Janette induced Plaintiffs not to cancel the transaction knowing that BizDoc would not fund the Loans. Rather, the record indicates Janette wanted BizDoc to fund the Loans so that Jordan could pay Plaintiffs and the deal would go through.

In addition, the fact that BizDoc believed U.S. Metro to be overvalued was immaterial to the overall message contained in the email. "A misrepresentation is material if a reasonable person would attach importance to its existence or nonexistence in determining [his or her] choice of action in the transaction in question." *Sitton v. Deutsche Bank Nat. Trust Co.*, 311 P.3d 237, 243 (Ariz. Ct. App. 2013) (internal

---

P. 321 (Ariz. 1931) (listing elements of claim for deceit, which are substantially similar to the modern day elements for a claim of fraud). Thus, the Court will analyze the two claims as a single claim for fraud.

- 10 -

1    quotation marks omitted).  Janette's email did not mislead Brian Katt into thinking that
2    the full amount of the Loan would be funded; the email specifically stated that BizDoc
3    was no longer sure that the entire Loan would be funded.  Although Brian Katt now
4    claims he would have cancelled the transaction based on the comment that U.S. Metro
5    was overvalued, his conduct throughout the U.S. Metro transaction convinces the Court
6    otherwise.  It is undisputed that the Katts repeatedly agreed to push back the funding date
7    to allow extra time for funding, executing three amendments along the way.  Several
8    different reasons were provided by BizDoc for the delay, none of which affected
9    Plaintiffs' choice of action.  At all times, Plaintiffs knew the Loan had not yet been
10   funded and Jordan and Janette consistently updated Plaintiffs about the status of the
11   Loan.  Plaintiffs had many opportunities to rescind the sale, which was permitted by the
12   Purchase Agreement, but they repeatedly chose not to.  In fact, less than three weeks after
13   the closing, Brian Katt contacted an attorney about bringing suit against BizDoc, but
14   apparently decided against pursuing such action. Doc. 125-8 at 1-2; Doc. 125-19.  Thus,
15   the comment that U.S. Metro was overvalued is immaterial given that Plaintiffs would
16   have continued to wait for the Loan to be funded.

17          Even if the comment regarding U.S. Metro being overvalued was material, Janette
18   could not be liable to the Katts for the omission unless she had a duty to disclose it.  *See*
19   *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472
20   (9th Cir. 1987) ("Absent an independent duty, such as a fiduciary duty or an explicit
21   statutory duty, failure to disclose cannot be the basis of a fraudulent scheme.").  She was
22   on the opposite side of the transaction from the Katts, and BizDoc was her lender.  She
23   had no affirmative duty to disclose to the Katts every communication she had with her
24   lender.  She certainly was not a fiduciary to the Katts.  And under the transaction
25   documents, Jordan simply had to obtain proof that he had the necessary funds for the
26   purchase.  He assumed no duty to make the Katts privy to all lender communications.

27          The Court finds that no reasonable jury could find that Janette's email amounted
28   to fraud.  Summary judgment will be granted in favor of Janette on this claim.

**2.     Weston's Agreement to Act as Escrow Agent.**

Plaintiffs assert that Weston is liable for fraud and constructive fraud because he agreed to act as escrow agent when he had no intent to do so. Plaintiffs assert that Weston intended to defraud Plaintiffs by failing to hold the Bill of Sale in trust, failing to create escrow instructions, and concealing the fact that Weston represented Jordan. Defendants argue that there is no evidence that Weston intended not to act as escrow and that Weston owed no duties to Plaintiffs because an escrow was never opened.

Constructive fraud requires the existence of a legal or equitable duty owed to the plaintiff. *See Lasley*, 880 P.2d at 1138. The Court has already concluded that Weston's duty to perform as the escrow agent was never triggered because no escrow was ever opened. Thus, no fiduciary relationship was created, no breach occurred, and Plaintiffs' constructive fraud claim necessarily fails. *See id.*

With respect to fraud in general, Plaintiffs have provided no evidence that Weston intended to defraud Plaintiffs in any way. Nor do Plaintiffs point to any representation made by Weston that could serve as the basis for fraud. Weston's offer to act as escrow agent was not a false representation. The fact that he never actually acted as escrow agent was a result of BizDoc failing to fund the Loan, not some secret intent to avoid opening the escrow. And Plaintiffs' claim that Weston defrauded them by failing to disclose a conflict of interest is unpersuasive because the parties were familiar with each other and Plaintiffs knew Weston was representing Jordan in the transaction. Plaintiffs cannot show that they relied on any false representation by Weston to their detriment. *See Mahmoodi*, 229 P.3d at 1033-34.

**D.     Breach of Contract.**

Defendants move for summary judgment on Plaintiffs' breach of contract claim. Doc. 1, ¶¶ 166-71. Plaintiffs allege that Weston and his firm breached the July 2, 2013 oral contract for Weston to serve as escrow agent for the U.S. Metro transaction.

To prevail on a breach of contract claim, a plaintiff is required to prove the existence of a contract, breach of the contract, and damages. *See Goodman v. Physical*

- 12 -

1  *Resource Eng'g, Inc.*, 270 P.3d 852, 855 (Ariz. Ct. App. 2011). "The essential elements
2  of a valid contract are an offer, acceptance, consideration, a sufficiently specific
3  statement of the parties' obligations, and mutual assent." *Muchesko v. Muchesko*, 955
4  P.2d 21, 25 (Ariz. Ct. App. 1997). "A finder of fact may conclude that a contract exists
5  based solely on the parties' conduct." *Id.*

6  Defendants argue the alleged contract is not supported by any consideration and it
7  is void under the Purchase Agreement, which contains an integration clause prohibiting
8  oral modifications. Neither argument is persuasive. First, the evidence suggests that
9  Weston offered to act as escrow agent for a lesser amount than it would have cost to
10 retain Mendel Blumenfeld. *See* Doc. 105-3 at 5-6 (Femia, referring to Weston: "[H]e
11 was the one that volunteered almost, that . . . [w]e can get . . . a title company to do this,
12 or . . . we could do it in-house, basically, it's going to cost you more money than it is over
13 here[.]"). Payment for his services was contemplated by the parties and would constitute
14 sufficient consideration to form a contract. In addition, Plaintiffs correctly point out that
15 the Purchase Agreement was executed between Plaintiffs and Jordan, not Weston. Here,
16 a separate contract would have formed between Weston and the parties to the sale. As
17 such, it would not have violated the integration clause in the Purchase Agreement.
18 Nonetheless, the Court finds Plaintiffs' claim fails.

19 As Defendants argue, even if an oral contract was formed, Plaintiffs cannot
20 establish breach because Weston's duty to perform was never triggered. "A condition
21 precedent is a fact which must exist or occur before a duty of immediate performance of a
22 promise arises[.]" *Cavanagh v. Schaefer*, 545 P.2d 416, 418 (Ariz. 1976) (internal
23 quotation marks omitted). As noted above, the implied condition precedent to Weston's
24 performance of the escrow contract was the opening of the escrow. This would have
25 occurred had he received the Bridge Loan and deposited it in his firm's trust account, or
26 had he received the Bill of Sale and held it in trust. Neither of these conditions occurred.

27 The undisputed facts show that even if a valid contract was formed, Weston did
28 not breach it. Weston and McCarthy Weston, PLLC are entitled to summary judgment

on this claim.

### E. Remaining Tort Claims.

Defendants move for summary judgment on Plaintiffs' claims of unjust enrichment, negligence, and tortious breach of the covenant of good faith and fair dealing. Defendants argue the claims are barred by the economic loss doctrine because Plaintiffs do not seek damages for physical injury to themselves or property.

"The economic loss doctrine prohibits certain tort actions seeking pecuniary damage[s] not arising from injury to the plaintiff's person or from physical harm to property." *Sullivan v. Pulte Home Corp.*, 306 P.3d 1, 3 (Ariz. 2013) (internal quotation marks omitted). "In Arizona, the doctrine bars only the recovery of pecuniary or commercial damage, including any decreased value or repair costs for a product or property that is itself the subject of a contract between the plaintiff and defendant, and consequential damages such as lost profits." *Id.* (internal quotation marks omitted). This doctrine has not been extended to "non-contracting parties" and "does not pose a barrier to tort claims that are otherwise permitted by substantive law." *Id.*

Plaintiffs allege tort claims against Janette, Weston, and Weston McCarthy, PLLC. It is undisputed that none of these parties were signatories to the Purchase Agreement. Because they are non-contracting parties, the doctrine does not apply. *See id.* Summary judgment will not be granted on these claims.

### III. Plaintiffs' Application for Entry of Default.

On July 23, 2014, the Clerk entered a default against Defendants BizDoc and Shumacher pursuant to Rule 55(a). Doc. 64. Plaintiffs now seek a Rule 55(b) default judgment against both Defendants for $870,000 in actual damages and $2,900,000 in punitive damages. Doc. 101. Plaintiffs allege that BizDoc and Shumacher "scammed over 2,000 [borrowers] out of the $7,500 each, thus 'earning' the BizDoc Defendants over $15,000,000 for simply stringing along out-of-state borrowers without loaning funds." Doc. 97. Plaintiffs allege this scam resulted in the collapse of the U.S. Metro

transaction, which caused them financial harm.[5]

Because default has been entered under Rule 55(a), the Court has discretion to grant default judgment pursuant to Rule 55(b). *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Factors the Court should consider in deciding whether to grant default judgment include (1) the possibility of prejudice to Plaintiffs, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) the policy favoring a decision on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). In applying these factors, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); *see* Fed. R. Civ. P. 8(d). Plaintiffs' brief contains no discussion of the *Eitel* factors.

### A.     Prejudice to Plaintiffs.

In determining whether a plaintiff will suffer prejudice, courts look to whether the plaintiff will be "without other recourse for recovery." *PepsiCo, Inc. v. Cal. Security Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Here, Plaintiffs have settled with some Defendants and have outstanding claims against others. In fact, Plaintiffs do not argue they will suffer any prejudice should the Court choose not to enter a default judgment. Thus, the Court finds this factor does not weigh in favor of Plaintiffs' position.

### B.     Merits of Claims and Sufficiency of Complaint.

Plaintiffs bring claims against BizDoc and Shumacher for fraud, deceit, negligence, and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. *Eitel* "require[s] that a plaintiff state a claim on which the [plaintiff] may recover." *Philip Morris U.S.A., Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003). In their brief, Plaintiffs do not analyze their claims. Instead,

---

[5] The Court previously denied Plaintiffs' application because the Clerk had not yet entered a default against BizDoc and Shumacher. Doc. 51.

- 15 -

they assert they are victims of BizDoc's borrower fee scam and that they were left "financially devastated" as a result. Doc. 97. But it was Jordan that paid the $7,500 fee that was never refunded, not Plaintiffs. And even if Plaintiffs did discuss the merits of their claims, the Court has doubts that they would be successful.

All of Plaintiffs' claims require a showing of "but for" causation and proximate causation. *See Mahmoodi*, 229 P.3d at 1033-34 (noting "but for" and proximate causation requirements for claims of fraud and deceit); *Rogers ex rel. Standley v. Retrum*, 825 P.2d 20, 22 (Ariz. Ct. App. 1991) (noting requirement of "but for" causation and proximate causation for negligence claims); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (requiring a plaintiff to demonstrate that the defendant's RICO violations were the "but for" cause and proximate cause of his or her injury). Taking the allegations as true, the Court finds Plaintiffs establish "but for" causation, but not proximate causation.

"But for" cause "exists if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 667 P.2d 200, 205 (Ariz. 1983). "Defendant's act need not have been a 'large' or 'abundant' cause of the final result." *Id.* Here, it is clear that BizDoc's failure to fund the Loan partially contributed to the collapse of the U.S. Metro sale, which resulted in financial damage to Plaintiffs. Had BizDoc funded the Loan by the date of closing, as they had represented, Plaintiffs would have received $290,000.

"The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Brand v. J.H. Rose Trucking Co.*, 427 P.2d 519, 523 (Ariz. 1967). "An original actor may be relieved from liability for 'the final result when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor[.]'" *McMurtry v. Weatherford Hotel, Inc.*, 293 P.3d 520, 532 (Ariz. Ct. App. 2013). Here, several intervening acts broke the chain of causation. First, when the Loan failed to fund by closing, Plaintiffs

turned over the Bill of Sale and keys to Jordan with full knowledge that he had not yet received the money from BizDoc or paid it to them.  Second, in executing the Third Amendment, Plaintiffs extended Jordan a line of credit, which allowed Jordan to make monthly payments without BizDoc's funding, effectively erasing any damage done by BizDoc's failure to issue the Loan.  Third, Plaintiffs breached the Purchase Agreement when it was discovered that the tow trucks were subject to liens and some of the contracts were expired.  Fourth, Jordan refused to return U.S. Metro to Plaintiffs even after he failed to remit the full purchase price.  Fifth, Plaintiffs failed to cancel the contract several times when circumstances were questionable.  These acts, which reflect Plaintiffs' poor business judgment and breach of the Purchase Agreement, are unforeseeable, and thus relieve BizDoc and Shumacher of liability for their failure to fund Jordan's Loan.  Consequently, Plaintiffs cannot establish the proximate causation element of any of their claims against BizDoc and Shumacher.

### C.    Remaining Factors.

The Court need not address the remaining factors as Plaintiffs have failed to establish the merits of their claims.  The Court will not enter a default judgment against BizDoc and Shumacher.

**IV.    Motions to Strike.**

The parties filed two motions to strike.  Plaintiffs argue that Defendants improperly raised new arguments in their reply brief.  Doc. 134.  But the Court finds Plaintiffs' motion to strike adequately addressed any new arguments raised by Defendants, and the Court took Plaintiffs' motion into consideration. The motion will be denied.

Defendants argue Plaintiffs impermissibly filed a separate statement of facts in conjunction with their reply brief.  Doc. 131.  The Court did not consider Plaintiffs' reply statement of facts.  This motion will be denied as moot.

**IT IS ORDERED:**

1. Plaintiffs' motion for partial summary judgment (Doc. 102) is **denied**.
2. The Weston Defendants' motion for summary judgment (Doc. 113) is **granted-in-part and denied-in-part**.
3. The Weston Defendants' motion to strike (Doc. 131) is **denied**.
4. Plaintiffs' motion to strike (Doc. 134) is **denied**.
5. Plaintiffs' application for default judgment (Doc. 96) is **denied**.
6. Defendants are granted summary judgment on the following claims: (1) Count 1 – Breach of Fiduciary Duty; (2) Count 2 – Constructive Fraud; (3) Count 3 – Fraud; (4) Count 4 – Deceit; and (5) Count 6 – Breach of Contract. Plaintiffs' claims for unjust enrichment, negligence, and tortious breach of the covenant of good faith and fair dealing survive.
7. The Court will set a final pretrial conference by separate order.

Dated this 26th day of June, 2015.

_____
David G. Campbell
United States District Judge